AO 91 (rev.11/11) Criminal Complaint       AUTHORIZED AND APPROVED DATE: [signature] 2/5/18

# United States District Court
for the

__WESTERN__ DISTRICT OF __OKLAHOMA__

FILED
FEB 05 2018
CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____, DEPUTY

United States of America )
)
v. )
)  Case No: M-18-76-BMJ
NAIF ABDULAZIZ M. ALFALLAJ, )

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### COUNT 1

In or about March 2012 to the present, in the Western District of Oklahoma, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1546(a) | Use, attempt to use, possess, obtain, accept, and receive a Nonimmigrant Visa, which was known to be procured by means of a false, fictitious and fraudulent claim and statement and otherwise procured by fraud. |

### COUNT 2

On or about the date of October 2, 2016, in the Western District of Oklahoma, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1546(a) | Use, attempt to use, possess, obtain, accept, and receive a Nonimmigrant Visa, which was known to be procured by means of a false, fictitious and fraudulent claim and statement and otherwise procured by fraud. |
| 18 U.S.C. § 2 | Aiding and abetting. |

### COUNT 3

On or about the date of December 4, 2017, in the Western District of Oklahoma, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1001(a)(2) | Knowingly make a materially false, fictitious, or fraudulent statement or representation involving international terrorism. |

This criminal complaint is based on these facts:

See attached Affidavit of Special Agent, D. Hunter Marsh, Federal Bureau of Investigation, which is incorporated and made a part hereof by reference.

☒  Continued on the attached sheet.

_____
*Complainant's signature*
Special Agent, D. Hunter Marsh
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date: 2/5/18

_____
*Judge's signature*

City and State: Oklahoma City, Oklahoma

BERNARD M. JONES, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA

v.

NAIF ABDULAZIZ M. ALFALLAJ

Case No. MJ-18-76-BMJ

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR COMPLAINT**

I, D. Hunter Marsh, Special Agent with the Federal Bureau of Investigation, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation's ("FBI") Joint Terrorism Task Force ("JTTF"), where I investigate violations of federal criminal law. I have been employed as a SA with the FBI since 2009. During my career, I have conducted terrorism investigations concerning incidents occurring in the United States and abroad. I have also received specialized counterterrorism training on both domestic and foreign terrorist organizations. I have participated in investigations involving individuals suspected of terrorist activities, assisted in the execution of search and arrest warrants, conducted physical surveillance, analyzed records, and have recruited and spoken to informants and subjects of investigations involving numerous types of federal violations.

2. I have personally participated in the investigation set forth below. The facts in this Affidavit come from my personal observations, my review of documents related to this investigation, oral and written communications with others who have personal knowledge of the events and circumstances described herein, a review of public source information including information available on the Internet, my training and experience, and information obtained from

other agents and witnesses. This Affidavit is intended to show there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. Based on my training and experience and the facts as set forth in this Affidavit, I believe there is probable cause to believe that **NAIF ABDULAZIZ M. ALFALLAJ** ("**ALFALLAJ**") knowingly committed the following offenses against the United States, to wit: Making a Materially False, Fictitious, or Fraudulent Statement or Representation Involving International Terrorism, in violation of 18 U.S.C. § 1001(a)(2); Fraud and Misuse of Visas, Permits, and other Documents, in violation of 18 U.S. C. § 1546(a), and Aiding and Abetting, in violation of 18 U.S.C. § 2.

**In support thereof, your Affiant states the following:**

### INVESTIGATION TO DATE

Background on **ALFALLAJ** and his Nonimmigrant Visa Application

4. On or about October 18, 2011, **ALFALLAJ,** a native and citizen of Saudi Arabia, electronically submitted an application to obtain a United States nonimmigrant visa. On his application, **ALFALLAJ** stated that he was a spouse of an F-1 nonimmigrant student visa holder (his wife) who was coming to the United States as an academic or language student. Among other information, **ALFALLAJ** answered "No" on the application to the following three questions: (1) "Do you seek to engage in terrorist activities while in the United States or have you ever engaged in terrorist activities?"; (2) "Have you ever or do you intend to provide financial assistance or other support to terrorists or terrorist organizations?"; and (3) "Do you have any specialized skills or training, including firearms, explosives, nuclear, biological, or chemical experience?" Moreover, when asked if he had traveled to any countries in the last five years, and if so, to list the countries that he had visited, **ALFALLAJ** answered "Yes" and provided that he traveled to Switzerland,

France, Germany, Italy, and Spain. **ALFALLAJ** electronically signed his nonimmigrant visa application under penalty of perjury pursuant to 28 § U.S.C. 1746, and certified with his electronic signature that he understood that any willfully false or misleading statement or willful concealment of a material fact within the application may subject him to criminal prosecution.

5. On or about October 24, 2011, **ALFALLAJ's** nonimmigrant visa application was approved.

6. On or about December 29, 2011, **ALFALLAJ** first entered the United States using his nonimmigrant visa, and has continued to use his visa to re-enter the United States after foreign travel. Since on or about March 2012, **ALFALLAJ** has been residing within the Western District of Oklahoma with his wife, who is an F-1 nonimmigrant student visa holder, and children.

7. On or about October 2, 2016, **ALFALLAJ** used his nonimmigrant visa when applying for initial training with a private flight school located within the Western District Oklahoma ("the flight school"). Section 1552 of Title 49 of the Code of Federal Regulations provides regulations that flight schools must follow. In accordance with 49 C.F.R. 1552.3(c)(2), **ALFALLAJ** was required to submit to the Transportation Security Administration ("TSA"), in addition to other items, the following: a copy of **ALFALLAJ's** current, unexpired passport and visa; **ALFALLAJ's** passport and visa information, including all current and previous passports

and visas held by **ALFALLAJ** and all the supporting information necessary to obtain a passport and visa; **ALFALLAJ's** fingerprints, and any other information required by TSA.

8. When **ALFALLAJ** submitted his application for the Alien Flight Student Program (AFSP)[1], he was specifically admonished and required to certify that:

> Title 18 Section 1001 of the U.S. Code provides that knowingly falsifying or concealing a material fact is a felony that may result in fines of up to $10,000 or 5 years in prison or both. By submitting this form, you are

---

[1] The mission of the AFSP is to ensure that foreign students seeking training at flight schools regulated by the Federal Aviation Administration (FAA) do not pose a threat to aviation or national security. Section 612 of the Vision 100 - Century of Aviation Reauthorization Act (Public Law 108-176, December 12, 2003) prohibits flight schools regulated by the Federal Aviation Administration (FAA) from providing flight training to a foreign student unless the Secretary of Homeland Security first determines that the student does not pose a threat to aviation or national security. Vision 100 transferred responsibility for conducting security threat assessments for foreign students seeking flight training from the Department of Justice to the Department of Homeland Security. On September 20, 2004, the TSA issued an interim final rule establishing the AFSP. Persons seeking flight training must submit a request if they are not citizens or nationals of the U.S. and they wish to receive flight training in the U.S. or its territories, regardless of whether training will lead to an FAA certificate or type rating; and/or they wish to receive flight training from an FAA-certificated facility, provider, or instructor that could lead to an FAA rating whether in the U.S. or abroad. Candidates must create an AFSP account and log into the AFSP Candidate Website www.flightschoolcandidates.gov to submit their background information and required documentation. The Candidate then submits Category 1-3 flight training request(s), and/or selects Flight Training Provider(s) to submit Category 4 training request(s) on their behalf. Once a training request has been submitted and successfully paid, the Candidate will then receive an email with detailed instructions on how to complete the application process. Each step must be completed before a Candidate advances to the next step. Once these items are completed, the AFSP performs a security threat assessment to determine whether the Candidate poses a threat to aviation or national security. https://flightschoolcandidates.gov./afsp2/?acct_type=c&section=WN#G1

certifying that the information provided herein is true and complete to the best of my knowledge and ability.

I hereby declare under penalty of perjury that the information contained on this form is true and correct.

9. On or about June 28, 2017, **ALFALLAJ** completed initial flight school training at the flight school.

Background on al Qaeda and al Qaeda's al Farooq Terrorist Training Camp

10. On October 8, 1999, the Secretary of State designated al Qaeda as a Foreign Terrorist Organization ("FTO"), pursuant to Section 219 of the Immigration and Nationality Act. Al Qaeda has remained so designated through and including the present time. Al Qaeda is an international terrorist group dedicated to opposing non-Islamic governments with force and violence. Beginning in August 1996, the then leader of al Qaeda, Usama bin Laden ("UBL"), a Saudi national, started issuing "fatwas"[2] that began to call for violence against Americans. On or about August 23, 1996, UBL made a written declaration entitled, "Message from Osama Bin Laden to Muslims around the Whole World and Especially in the Arabian Peninsula; Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Mosques; Expel the Heretics from the Arabian Peninsula." This fatwa – commonly referred to as UBL's Declaration of War or the "Declaration of Jihad" – sought to expel U.S. nationals from the Arabian Peninsula and named Americans as the enemy of the Ummah, which refers to the worldwide Muslim community. UBL followed up the Declaration of Jihad with another fatwa issued on or about February 23, 1998, with Ayman al-Zawahiri's group, the Egyptian Islamic Jihad ("EIJ"), encouraging Muslims to kill Americans and their allies, including civilians and military, no matter where they are in the world.

---

[2] Based on my training and experience, I know that "fatwas" are religious proclamations.

5

This fatwa was considered in many respects to be a declaration of war on the United States. Less than six months later, on or about August 7, 1998, al Qaeda conducted a truck bomb attack on two U.S. Embassies in East Africa—Nairobi, Kenya and Dar es Salaam, Tanzania—causing the deaths of over 200 people and injuring thousands of others.

11. In support of its terrorist plots, al Qaeda sponsored, managed, and/or financially supported training camps in Afghanistan, and those camps were used to instruct and train members and associates of al Qaeda and its affiliated terrorist groups in the use of firearms, explosives, chemical weapons, and other weapons of mass destruction.

12. One of the most prominent al Qaeda training camps during the late 1990s through early 2000s was the al Farooq training camp, which was located outside of Kandahar, Afghanistan. Members of al Qaeda's senior leadership were also located in Kandahar in the 2000-2001 timeframe. In 2000, UBL challenged his group to increase recruitment efforts in Saudi Arabia and Yemen. Moreover, during this time, al Farooq became a popular camp for initial training and indoctrination of violent jihad and basic military tactics used for offensive operations. Some of al Qaeda's most notorious leaders and operatives were trained and/or were instructors at the al Farooq camp, including, some of UBL's highest ranking deputies, several of the hijackers from the September 11, 2001 terrorist attacks, and at least one individual who was convicted for his role in the 1998 East Africa Embassy bombings. Indeed, UBL frequently visited al Farooq during this time and spoke with the trainees. Beginning in at least sometime in 2000, immediately prior to attending al Farooq, and while present at an al Qaeda-sponsored safe house in Afghanistan, camp participants would fill out in-processing paperwork, also known as "Mujahedeen Data Forms," "questionnaires" or "camp applications," in which prospective al Qaeda recruits provided personal information regarding their background as well as their desired goals. In order to get to the safe

house and fill out the Mujahedeen Data Forms, the al Qaeda recruit must have already been vetted by a trusted al Qaeda associate. The applicants would typically not put their true and correct names on these forms, but would rather place their "kunya," or nickname, by which they wanted to be identified. Moreover, the form requests the applicant to provide the name of the person(s) whom recommended or sponsored them for the training, as well as the names of any individual in Afghanistan who the applicant knew.

13. Shortly after the September 11, 2001 terrorist attack, the U.S. Military engaged in a series of raids in Afghanistan. More specifically, on or about December 8, 2001, during military operations in Afghanistan, U.S. personnel conducted a series of raids on known and suspected al Qaeda locations, including safe houses and buildings used for administrative purposes. One such building was a suspected al Qaeda safe house, which has been referred to as the "Arab Office," located in Kandahar, Afghanistan. Included in the large volume of materials seized from the Arab Office were well over 100 Mujahedeen Data Forms associated with the basic training at al Qaeda's al Farooq camp. All of the materials seized from the Arab Office, including these Mujahedeen Data Forms, were provided to the FBI for further review and analysis.

**ALFALLAJ's Fingerprints were found on al Qaeda Mujahedeen Data Form**

14. On or about March 21, 2017, investigators of the FBI requested fingerprint analysis of some of the Mujahedeen Data Forms discovered from the aforementioned December 8, 2001 raid.

15. On or about November 3, 2017, the FBI's Latent Print Operation Unit confirmed a positive match for 15 latent fingerprints belonging to **ALFALLAJ** on one of the Mujahedeen Data

Forms.[3] The fingerprint matches came from prints that **ALFALLAJ** was required to provide when applying for his pilot's license in October 2016. **ALFALLAJ's** fingerprints were found on pages two, three, and five of the five-page form. The questions on the form are written in Arabic and the responses are also written in Arabic. An FBI linguist translated the form from Arabic to English. The kunya listed on the form is "Muthana Al-Najdi" who claims to be from Riyadh, Saudi Arabia, **ALFALLAJ's** city of birth. The Mujahedeen Data Form is signed with a date of September 2000.[4] Additionally, the emergency contact information listed on the Mujahedeen Data Form includes a cellular telephone number associated with **ALFALLAJ's** father.[5] **ALFALLAJ** also provided

---

[3] A total of 22 latent prints were discovered on the five-page application. Five latent prints were excluded as belonging to **ALFALLAJ**. Two latent prints could not be identified as belonging to **ALFALLAJ**, nor could they be excluded and have been deemed "inconclusive" at this time.

[4] If this date and the date of **ALFALLAJ's** known birthday are accurate, **ALFALLAJ** would have been just two months shy of his 17th birthday.

[5] The form sought information on the address and telephone number of the applicant's nearest relative "upon need," which I believe is an emergency point of contact. **ALFALLAJ** provided "father" and three different telephone numbers, including " 05XXXXXXX." (seven digits of the telephone number have been redacted from this Affidavit to protect **ALFALLAJ's** father's privacy.) On **ALFALLAJ's** father's nonimmigrant visa application to the United States, which was completed in September 2014, **ALFALLAJ's** father listed his telephone number as "96655XXXXXXX." (The last seven digits that have been redacted from this telephone number are the same seven digits identified on **ALFALLAJ's** Mujahedeen Data Form.) During the course of this investigation, I have learned that, in Saudi Arabia, "0" is a commonly used number to call another telephone number outside of the local area network and "966" is Saudi Arabia's country code. I also know that, in 2004, Saudi Arabia recognized the potential that it would run out of telephone numbers (based on demand) and added a digit to mobile phone numbers, including numbers previously assigned. As such, the extra "5" in the telephone number **ALFALLAJ's** father provided in his U.S. visa application is a post-2004 addition. Finally, I know that the telephone number provided is a cellular telephone number issued by Saudi Telecom because of the digits "55."

additional information on the Mujahedeen Data Form. Specifically, he acknowledged that he would adhere to the designated training period of two months and that he would not leave the camp without permission for any excuse. **ALFALLAJ** further wrote that his hobbies included, "more training on military matters;" that he was motivated to go to travel to Afghanistan after hearing of the death of "brother Muthanna Al-Qasimi" and "hearing a lot about jihad in "Al-Qasim (Buraydah)." Indeed, in response to the question about what field he'd like to work in, **ALFALLAJ** wrote, "a mujahid for the sake of God," and in response to the question whether he had any advice for his Mujahidin brothers, **ALFALLAJ** wrote, "[m]y advice to them is not to return to their families because this life is sedition and hardships and your way is the path to paradise, God willing." Finally, **ALFALLAJ** responded that he had not trained prior to coming to Afghanistan.

**ALFALLAJ's Interviews with the FBI**

16. On or about December 1, 2017, **ALFALLAJ** called the FBI's Oklahoma City Field Office. During the phone call, **ALFALLAJ** said that he believed that someone had possibly reported him to the government and requested a meeting with the FBI.[6]

17. On or about December 4, 2017, pursuant to his request, I met with **ALFALLAJ**. This interview was conducted at the FBI Oklahoma City Field Office and was audio and video

---

[6] I am aware that the FAA sent **ALFALLAJ** an "IMMEDIATELY EFFECTIVE ORDER OF REVOCATION" dated September 15, 2017, informing **ALFALLAJ** that all certificates issued to him by the FAA, including his Private Pilot Certificate which had been issued in November 2016, were immediately revoked and that ALFALLAJ must immediately surrender his certificates or face a monetary penalty. The Order stated that it was being issued because TSA concluded that **ALFALLAJ** posed, or was suspected of posing, a risk of air piracy or terrorism, or a threat to

9

recorded. SA Rebecca Perkins, a member of the JTTF and an agent with Immigration and Customs Enforcement's Homeland Security Investigations ("HSI"), was also present during the interview. SA Perkins had been participating in the terrorism investigation involving **ALFALLAJ** since its inception. At the beginning of the interview, I introduced myself to **ALFALLAJ** and informed him that we have a Joint Terrorism Task Force, which includes many police departments and government agencies that work together. I explained that SA Perkins knew more about immigration issues and could possibly help explain those issues. During the interview, I informed **ALFALLAJ** that it was important to provide truthful statements. Specifically, prior to going over the questions on **ALFALLAJ's** nonimmigrant visa application, I advised him that if there is something in the application that is wrong, it was important that he let me know. I again informed **ALFALLAJ** that I worked on a terrorism task force. I asked **ALFALLAJ** if there were any places he had travelled that he had not listed on his visa. **ALFALLAJ** stated that he had travelled to Egypt, Morocco, Malaysia, Dubai, Jordan, and Kuwait. I told **ALFALLAJ** that I wanted to ask him about countries that would be of concern. I asked him if he had been to Somalia, Yemen, or Afghanistan. **ALFALLAJ** denied travel to all three of these countries, but volunteered that he had been to Syria in 2008. I also asked if he had been to Iran, North Korea, Russia, or Bosnia. **ALFALLAJ** denied travel to any of these countries. Finally, I asked **ALFALLAJ** if he has ever associated with anyone from a foreign terrorist group. **ALFALLAJ** denied this. After going over all of the questions, I stressed that it was important for **ALFALLAJ** to provide truthful statements.

---

airline or passenger safety which caused TSA to request the Administrator of the FAA to issue the Order, which he did pursuant to 49 U.S.C. § 46111(a).

I asked these questions in relation to an investigation that involved international terrorism as defined by 18 U.S.C. § 2331.

18. On or about January 9, 2018, during a phone call that was recorded, **ALFALLAJ** confirmed that the telephone number listed on his father's nonimmigrant visa application is correct, and that it had been his father's cellular telephone number for approximately 15 years.

19. I know through interviews conducted of individuals that attended al Qaeda's al Farooq training camp and/or worked at the Arab Office that the Mujahedeen Data Forms such as the one that **ALFALLAJ** filled out would have only been completed once an individual was present at the Arab Office, or safe house, in Afghanistan prior to being taken to the al Farooq training camp.

## CONCLUSION

20. Based on the forgoing, I believe there is probable cause to believe that **NAIF ABDULAZIZ M. ALFALLAJ** did knowingly make a materially false, fictitious, or fraudulent statement or representation involving international terrorism, in violation of 18 U.S.C. § 1001, and did use, attempt to use, possess, obtain, accept, and receive a Nonimmigrant Visa, which he knew to be procured by means of a false, fictitious, and fraudulent claim and statement and otherwise procured by fraud in violation of 18 U.S.C. § 1546(a) and including aided and abetted the use of the visa fraud in violation of 18 U.S.C. § 2.

Respectfully submitted,

_____
D. Hunter Marsh
Special Agent
Federal Bureau of Investigations

Subscribed and sworn to before me on ___February 5___, 2018

_____
BERNARD M. JONES
UNITED STATES MAGISTRATE JUDGE